UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

In re:

KESHIA MARIE LEE,

           Debtor.

_____/

Case No. 23-02044-swd
Hon. Scott W. Dales
Chapter 7

MEMORANDUM OF DECISION AND ORDER

PRESENT:    HONORABLE SCOTT W. DALES
Chief United States Bankruptcy Judge

On January 4, 2024, the court entered its Order Discharging Debtor (the "Discharge," ECF No. 34), and on May 2, 2024, the Clerk entered the final decree closing the case of *pro se* chapter 7 debtor Keshia Marie Lee (the "Debtor").  On June 6, 2024, the Debtor filed a motion seeking, among other relief, an order to reopen her case (ECF No. 53, the "Motion").

In the Motion, the Debtor alleges that the Community Promise Federal Credit Union ("Community Promise") repossessed her 2015 Mitsubishi Outlander (the "Outlander") even after she fully paid the related automobile loan.  She also alleged that Community Promise made a false report to a credit reporting agency about the loan, and violated the discharge injunction by, for example, threatening to (i) garnish her wages or other property, and (ii) seek a post-discharge judgment for whatever deficiency may remain after the Article 9 sale of the Outlander scheduled for June 27, 2024.

In response to the Motion, and to assist the Debtor with potential violations of the Discharge, the court entered its Combined Order to Reopen Case and to Show Cause why

Community Promise should not be held in contempt of the discharge injunction (ECF No. 54, the "Combined Order"). The court held an evidentiary hearing in this contested matter to consider whether to hold Community Promise in contempt of the Discharge on June 18, 2024, in Kalamazoo, Michigan. *See* Fed. R. Bankr. P. 9020 (contempt hearings are contested matters under Rule 9014).

At that hearing, the court repeatedly reminded the parties that there is no remaining federal interest in the Outlander by operation of 11 U.S.C. § 362(h), which automatically removed it from the bankruptcy estate early in the case, ending the court's usual *in rem* jurisdiction over the vehicle. *See* Memorandum of Decision and Order dated March 20, 2024 (ECF No. 51) at p. 4. Moreover, the court's order last fall (ECF No. 28) granting Community Promise's Motion for Relief from Stay expressed the court's decision to leave the competing interests in the Outlander to applicable non-bankruptcy law and the state courts. The court explained in its Memorandum of Decision and Order dated March 20, 2024, and reiterated in the Combined Order, that it previously reserved the propriety of Community Promise's repossession and sale of the Outlander for the state courts. In doing so, the court narrowed the issue at this week's hearing to the questions of (i) whether Community Promise violated the Discharge by threatening to enforce the debt secured by the Outlander as a personal obligation of the Debtor in violation of 11 U.S.C. § 524(a)(2); and (ii) if so, whether the violation amounted to contempt.

The Debtor testified in narrative form that Community Promise's branch manager, Angela Banuelos, called her in March of this year, threatening to garnish her wages or other property if she did not surrender the Outlander. The court credits her testimony in that respect. The Debtor also offered, and the court admitted, four exhibits including an Article 9 notification from Community Promise's repossession agency stating that she is responsible for the difference

between the balance remaining due on her loan from Community Promise and the sale price of the Outlander (the "Notice of Lien Holder's Plan to Sell," Exhibit H).

Rob Viland, Community Promise's chief executive officer, testified on behalf of the credit union.  He explained that Ms. Banuelos was not available to testify because of her pre-planned vacation, but that he was familiar with the Debtor's file.  He described the credit union as a non-profit institution dedicated to serving a low-income and primarily African American community in Kalamazoo.  He has served as Community Promise's "CEO" for slightly more than a year.

Mr. Viland testified that he had no knowledge of threatening phone calls between Ms. Banuelos and the Debtor, nor did he ever instruct her or anyone else at Community Promise to threaten to garnish the Debtor's wages or other property.  Community Promise also introduced two exhibits that Mr. Viland claimed comprised all of the communications between the Debtor and the credit union regarding the Debtor's loan.  (Exhibits 1 and 2, the "Communications").  Nothing in the Communications constituted a threat, after entry of the Discharge, to collect the Debtor's car loan as her personal obligation.

Mr. Viland further testified that Community Promise retained Repocast (a third-party provider) to assist in recovering and selling the Outlander.  Repocast sent the Notice of Lien Holder's Plan to Sell as Community Promise's agent.  In closing arguments, Community Promise's counsel conceded that there may have been telephonic communications between Ms. Banuelos and the Debtor in March of 2024, but that Community Promise's only objective in contacting the Debtor was to repossess the car, not to pursue the debt as a personal obligation.

No other witnesses testified at the hearing.

A discharge under the Bankruptcy Code "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect,

recover or offset any such [discharged] debt as a personal liability of the debtor, whether or not discharge of such debt is waived." 11 U.S.C. § 524(a)(2). Courts enforce the discharge using their civil contempt powers. Accordingly, "violation of the discharge injunction exposes a creditor to potential contempt of court." *In re Orlandi*, 612 B.R. 372, 381 (B.A.P. 6th Cir. 2020) (citing *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 421-23 (6th Cir. 2000)). "Although civil contempt may serve incidentally to vindicate the court's authority, its primary purposes are to compel obedience to a court order and compensate for injuries caused by noncompliance." *TWM Manufacturing Co. v. Dura Corp.*, 722 F.2d 1261, 1273 (6th Cir. 1983) (citing *McCrone v. United States*, 307 U.S. 61, 64 (1939)).

The Supreme Court in *Taggart v. Lorenzen*, 587 U.S. 554 (2019), restated the standard for holding a creditor in contempt for violating a discharge. The High Court held that civil contempt is only appropriate in cases where "there is no fair ground of doubt as to whether the order barred the creditor's conduct." *Id*. at 561. As for the burden of proof, "[i]n a civil contempt proceeding, the petitioner must prove by clear and convincing evidence that the respondent violated the court's prior order." *In re City of Detroit*, 614 B.R. 255, 264 (Bankr. E.D. Mich. 2020) (quoting *Glover v. Johnson*, 138 F.3d 229, 240 (6th Cir. 1998)). Therefore, the court may only find contempt if it concludes by clear and convincing evidence that Community Promise's communications with the Debtor violated the Discharge and that there is no fair ground for doubt as to whether the creditor's actions were lawful.

The court finds by the requisite proofs that Community Promise violated the Discharge through its agents (Ms. Banuelos and Repocast) first when the branch manager threatened to pursue garnishment -- legal process not directed at the creditor's collateral but at the Debtor herself -- and again when the repossession company sent the Notice of Lien Holder's Plan to Sell. The

Debtor consistently and credibly testified that Ms. Banuelos raised the specter of garnishment in March, post-discharge, and the Communications demonstrate that Community Promise was aware of the Discharge by then.

Community Promise disputes that during the March telephone call Ms. Banuelos threatened the Debtor with garnishment, and it is true that the Debtor (who remains unemployed) had no wages to garnish, making the threat somewhat hollow.[1]  The court, however, credits the Debtor's testimony about the threats of garnishment for several reasons, in addition to its evaluation of her demeanor while testifying.  First, Ms. Lee came to court prepared primarily to argue that Community Promise wrongfully repossessed the Outlander because (she contends) she had paid for it.  Securing return of the vehicle was her primary motive in filing the Motion and her claim that Ms. Banuelos threatened garnishment was ancillary to the issue she was most concerned about.  Because the court infers that the Debtor was not aware of the legal significance of the specific threat of garnishment, her testimony in this respect seems genuine, not contrived to meet a legal standard.  Given her principal objective, she had no reason to stretch the truth regarding the March conversation with Community Promise's branch manager.[2]  Second, the only other person with direct knowledge of the phone call or the ability to refute the Debtor's version of events -- Ms. Banuelos -- was not present at the hearing.[3]

---

[1] We should not forget that the Discharge itself makes the threat hollow but nevertheless enjoins such intimidation. 11 U.S.C. § 524(a)(2).

[2] Ms. Lee's filings and testimony at times appeared peculiar and chimerical, including her signing documents with a fingerprint, her repeated capitalization of her name in pleadings, references in her testimony to a secret "trust account" at the U.S. Treasury, the separation of real and fictitious personas through a "living estate," to list a few examples. *See Gravatt v. United States*, 100 Fed. Cl. 279 (2011).  The court is not required to understand or accept every aspect of Ms. Lee's life or believe everything that she said during the hearing to credit discrete aspects of her presentation. The supposed and undocumented payment of her car loan in December by federal wire transfer has no bearing on the court's decision today which focuses on the post-discharge conduct of Community Promise, not Ms. Lee's beliefs.

[3] The court accepts Community Promise's statement that Ms. Banuelos could not attend the hearing due to her scheduled vacation and acknowledges that it scheduled the hearing on relatively short, but sufficient, notice.  *See* Fed. R. Bankr. P. 9006(d) (requiring seven-day notice of hearing on motion).  Community Promise might have asked for a short continuance pending its branch manager's return from vacation, but it did not.  Nevertheless, the court must take the record and witnesses as it finds them, always a risk of litigation.

Although the only evidence that Ms. Banuelos threatened to garnish the Debtor's wages or other property comes from the Debtor's testimony, the court nevertheless credits that testimony. Community Promise's counsel conceded that the call in March may have taken place, but its CEO testified that he had no personal knowledge of the existence or content of communications between Ms. Banuelos and the Debtor. Even crediting Mr. Viland's testimony that he did not instruct Ms. Banuelos to threaten collection activity beyond repossession, it is easy to infer that in the heat of dealing with an uncooperative debtor, a branch manager of a small credit union, under pressure to collect debts for the sake of all credit union members, may fall short of the mark, making less-than-carefully-calibrated word choices.

The creditor need not take formal legal action against a discharged debtor to contempt: threats and warnings may suffice if, as here, they constitute acts "to collect, recover or offset" a discharged debt. 11 U.S.C. § 524(a)(2). After all, Congress fashioned the discharge, in part, to "relieve debtors from the burdens, emotional and otherwise, of post-bankruptcy collection activity." *In re Distefano*, 611 B.R. 100, 103 (Bankr. W.D. Mich. 2019).

To summarize, the testimony clearly and convincingly shows that agents of Community Promise warned the Debtor that the credit union would pursue garnishment remedies if she did not turn over the Outlander, a patent violation of the Discharge.

The Debtor also introduced, and the court admitted without objection, a copy of the Notice of Lien Holder's Plan to Sell. The document, sent by Community Promise's repossession agent, states that "[t]he money that we get from the sale (after paying costs) will be used to reduce the amount you owe . . . [i]f we get less money than you owe, you will still owe the lien holder the difference." (Exhibit H.) The court reads that formal communication as inconsistent with the Discharge by failing to treat the Debtor's car loan as the nonrecourse debt it became after

January 4, 2024.  Under the circumstances, the credit union's foreclosure notice tends to coerce collection of the debt as a personal obligation, not simply by resorting to collateral.

Repocast's notice is undoubtedly a multipurpose form sent out to any debtor whose property will be sold under the enforcement provisions of Article 9 of the Uniform Commercial Code.  It is possible, of course, that Community Promise had no knowledge that its repossession agent uses such language for its members who have received a discharge in bankruptcy, but a principal must answer for the acts of its agents within the scope of the agency.  The court harbors no doubt that this language in the foreclosure notice served to warn the Debtor about actions the credit union could not legally take after entry of the Discharge.  As noted in *Distefano*, "[o]ne-size-fits-all or ready-to-wear business forms may dress a creditor's correspondence to its own advantage outside of bankruptcy, but after the order for relief such standardization is no longer suitable."  *In re Distefano*, 611 B.R. at 106.  Therefore, the court finds that when Repocast sent to the Debtor the offending Notice of Lien Holder's Intent to Sell, Community Promise, through its agent, violated the Discharge.

Finding a violation of the Discharge is a necessary but not sufficient condition for holding a creditor in contempt.  The court must also consider these findings in light of the standard set forth in *Taggart*.  The "fair ground of doubt" standard makes clear that the court may not impose sanctions, even for conduct that violates the discharge, if there is a reasonable question as to whether that conduct offends the court's order.  Here the court finds Community Promise's conduct was clearly contemptuous for the following reasons.

First, threatening to garnish a discharged debtor's wages or other property and sending a repossession notice treating a discharged debt as a recourse obligation undoubtedly violate the Discharge.  The creditor (who participated in the bankruptcy proceedings by filing a stay relief

motion) obviously had knowledge of the proceeding, and its own Communications, which refer to the Discharge, establish specific knowledge of the Discharge.  The command of the Discharge is clear.  Community Promise's post-discharge actions, though perhaps isolated or limited, do not present a close call or raise fair ground for doubt on this score.

Second, because Community Promise's agents made these communications to an unrepresented and unsophisticated borrower facing the loss of a motor vehicle, the court regards the conduct as particularly coercive.  *See In re Distefano*, 611 B.R. at 105.  In other words, because the Debtor lacked legal counsel and was facing the loss of her means of transportation, she was peculiarly vulnerable to the credit union's violation of the Discharge.[4]  At the hearing, she told the court she felt fearful after speaking with Ms. Banuelos.

For the reasons set forth above, the court holds Community Promise in contempt of the Discharge.

The only outstanding issue is the appropriate remedy.  The Debtor admitted on the record that she is not employed and therefore did not have to interrupt her work schedule (or lose wages) to file her Motion or attend the hearing.  She stated that she was fearful but made no attempt at the hearing to quantify or even define her injury.  Any monetary award on this record would rest on mere speculation. Moreover, the Debtor established only two examples of contemptuous conduct -- the threat of garnishment and the foreclosure notice.  Therefore, the court will not impose any compensatory relief.

The court, however, will enjoin Community Promise from taking further actions that violate the Discharge, especially any threats of garnishment or statements purporting to treat the

---

[4] For purposes of the statutory safe harbor governing post-discharge lien enforcement, Congress draws a distinction between creditors holding liens on real property (who are within the safe harbor) and those with liens on personal property (who are not).  11 U.S.C. § 524(j). The Outlander is, of course, personal property.

outstanding balance on the car loan as a personal obligation of the Debtor.  Although the court credits Mr. Viland's testimony that he did not personally instruct Ms. Banuelos or other agents to take actions that violated the Discharge, as his counsel emphatically said, "the buck stops with him."  Considering Community Promise's declared and laudable mission to serve the underserved, Mr. Viland and the credit union's other agents must take more care in training and supervision to ensure that the organization treats its clients (including those who merit a discharge in bankruptcy) in a manner consistent with their rights under federal law.  Based on Mr. Viland's testimony, and with the guidance of his capable counsel, the court has confidence that the credit union can fulfill its promise to the community while conforming its conduct to the law.

NOW, THEREFORE, IT IS HEREBY FOUND AND ORDERED as follows:

1. Community Promise violated the Discharge as set forth above and there is no fair ground for doubt about the violation;

2. Community Promise has shown contempt of the Discharge;

3. Community Promise is ENJOINED from threatening garnishment or otherwise pursuing collection of the car loan, including any deficiency after foreclosure, as a personal obligation of the Debtor;

4. The court will withhold any other relief on account of the contempt of the Discharge, except on further motion; and

5. Nothing in this Memorandum of Decision and Order shall affect the rights of the parties or any dispute with respect to the Outlander, matters for a non-bankruptcy forum.

IT IS FURTHER ORDERED that the Clerk shall close the Debtor's case, without further order or notice, not earlier than 45 days after entry of this Memorandum of Decision and Order, unless within that period a party in interest timely files a notice of appeal or other request for relief.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Memorandum of Decision and Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Sara E.D. Fazio, Esq., Nicholas J. Spigiel, Esq., Kenneth Lau, Esq., and Keshia Marie Lee (by U.S. Mail).

END OF ORDER

**IT IS SO ORDERED.**

**Dated June 21, 2024**



Scott W. Dales
United States Bankruptcy Judge